We'll go on to the next argument on the calendar. Myers v. Starbucks, 22-55930. Good morning, your honors. May it please the court, Katherine Sweetser, on behalf of plaintiffs, I'd like to reserve five minutes. I'm going to have a really hard time hearing you. I'm so sorry. That's okay. If you could keep your voice up, that'd be helpful. Yeah. I'd like to reserve five minutes for rebuttal, if possible. Okay. This case concerns the ability of consumers to make ethical choices at the grocery store. Reasonable consumers have an interest in consuming products that are traceable, which the parties agree means capable of being traced. It is undisputed in this case that at the time of sale, none of the cocoa in the Dove Dark Chocolate products at issue was traceable or capable of being traced. It is also undisputed that the vast majority of the cocoa that Myers buys and uses for the Dove Dark Chocolate products is not certified or traceable at any point. It is likely, as alleged in paragraph 43 of our complaint, that a significant portion of this chocolate is produced using child labor. The language on the package that Myers puts on its packages, as alleged in the complaint, is we buy cocoa from Rainforest Alliance certified farms, traceable from the farms into the factory. The plaintiff has alleged adequately that this is an affirmative misrepresentation. Okay. Let me go through that one, sort of provision by provision. We buy cocoa from Rainforest Alliance certified TM farms, is that correct? Yes. And that cocoa is traceable from the farms to our factory, is that correct? To the factory, yes. So the statement is literally true. It is literally true, yes. So you're arguing then that somehow it is misleading. Correct. And under California law, something that is literally true but misleading can violate California law. Yes. So tell me why this is misleading, such as to trigger a violation of California law, even though it is literally true. Yes. So, thank you, Your Honor. So the statement gives rise to a reasonable inference on the part of the reasonable consumer that the ingredients in the product are in fact traceable and certified. Saying that the cocoa is traceable from the farms into the factory, a reasonable consumer would not assume that, okay, then they stop tracing it, there might not be any certified cocoa in this product, that once it's in their control in the factory, that all of a sudden it is mingled with this other cocoa that is the majority of their cocoa that is in fact produced with child labor. The reasonable consumer in the grocery store is not going to think, okay, this product must have non-certified, non-traceable cocoa, but in fact that's what happens. Moreover, Mars only labeled some of the products and not others. At this stage in the litigation, do we have any consumer evidence in terms of how consumers are understanding this? No, we're at the motion to dismiss stage here. And in fact, under California law, which is very, very clearly set out in Colgan versus Leatherman tools, no extrinsic evidence is required, even at the summary adjudication stage. So plaintiffs would put forward... So I'm just supposed to decide on my own? If I were a consumer, would I be misled? No, in fact, that's I think where the district court erred. The question is whether the reasonable consumer, a reasonable consumer would make this inference and it only need be plausible at this stage. So whereas at the summary judgment phase or at trial, plaintiffs do intend to do a consumer survey and to get additional expert evidence. But at the motion to dismiss stage, it only needs to be plausible that someone could be misled? Precisely. Is the majority of people plausibly misled? How many? I mean, I can mislead, if you give me 10 people, I can mislead at least one of them by the most preposterous statement. The standard of the California law is actually just that any reasonable consumer could be misled by this. The defendants have the burden to show that no reasonable consumer would be misled by their statement. Okay. Yeah. So there are no surveys at this point. Okay. No, we haven't. We haven't put a survey into the complaint. But we have put some statistics on whether consumers care about these statements and that's in paragraph 7 of our complaint. That's what I wanted to go to. So what is it that you're saying that a reasonable consumer cares about here? The reason, or I guess Ms. Myers maybe, but what do they care about? Well, the reasonable consumer cares about whether this COCOA is traceable and monitored in the supply chain. They would care about whether Mars knows where and how they produced it. Why do they care about traceable in itself or why do they care about traceability? Well, for Ms. Myers, she does care about the ethical production of the COCOA. What does that mean? That's a really vague term. I don't, like, what is ethical production? What does that mean? In this case, it would mean produced without using this type of child labor, slave labor, forced labor in the supply chain. So she, so Ms. Myers and your reasonable consumer cares about whether or not this is produced without child labor. So, would it, is, if it came, if all of the COCOA in these bars came from Rainforest Alliance certified farms, would that mean that it was produced without child labor? We can't make that strong of a statement. However, the case law does not require it and it. Well, that's what I'm trying to figure out because why, it seems to me like that's what they care about. That's what they care about is that, is child labor free COCOA. And that seems to me that, I mean, that's what you say in your complaint. But if Rainforest certified, Rainforest Alliance certified COCOA isn't child labor free or you don't make any allegations about that in your complaint, then that's a kind of a missing, it's a kind of critically missing important link in, in your argument that, because I don't, consumers don't just care about traceability as an, like, in itself, do they? Well, there's, I think, two different responses to that. One is the legal, the case law argument, and one is the factual argument. So let me make the case law argument first. In Kwikset, which is the leading California Supreme Court case on this, there was a discussion of the made in America requirement. And they distinguished between the motive, the ultimate motive of consumers, and the factual allegations made by the company. So in Kwikset, they said, you know, when you're saying that something's made in America, consumers may ultimately care because they're patriots, they may ultimately care because they want labor practices to be good, they may ultimately care because they want environmental practices to be good. There might be a range of motivations. So what have you provided to us in your complaint, or even in your briefing, I suppose, that explains to us why consumers care about traceability to Rainforest Alliance certified farms that's not related to the child labor issue? I understand that maybe there would be other reasons they would care, but I'm trying to figure out where that is at in this case. In paragraph eight of our complaint, we state very simply that consumers care where and how their products are made. They care that the company has control over the process. I have a sort of related follow-up question. Are we looking at the, or should be, as a matter of law, be looking at the universe of reasonable consumers out there, or are we looking at the universe of reasonable consumers who are willing to pay a premium for this chocolate? I think your complaint alleges that this particular logo and representation on this label doesn't appear on all of the defendant's products, and that this product is a little more expensive. But you should correct me if I've got that wrong. No, that's correct. I do think that the relevant reasonable consumers who are misled by the product are the ones who are purchasing the product because they wanted to purchase an ethical product. The reasonable consumer standard assumes the consumer read the label and saw the label. Well, but to follow up on Judge Van Dyck's point, I can imagine that some consumers wouldn't care about this at all. They just really liked Dove chocolate or whatever kind of chocolate, and I can imagine other sort of more discerning folks who do read the labels and care. We have some case law recognizing this distinction, and I think it's the Manuka honey case, that is apparently, who knew, a special kind of honey, and then that might be a slightly different standard. And I just wanted to give both of you a chance to speak to that. Yes, I think the consumer that you're looking at is, in fact, the consumer that has these interests that is looking for an ethical product. So the reasonable consumer, again, we don't have to prove about every reasonable consumer that this is the only interpretation. Under Moore and Williams, the question is just, would some reasonable consumers have this interpretation? And I think the reasonable consumer looking for an ethical product would care that it's traceable to the certified farms, that some certification scheme is going on. So you think it doesn't matter, if I conclude, that some consumers wouldn't care about this at all? Is that right? It has no bearing on the reasonable consumer test at all. There's many different types of consumers, but not every consumer has to have the same interests. In a way, there are two reasonable consumers here at issue. Number one, how would a reasonable consumer interpret this statement? And then the other kind of reasonable consumer is, who cares enough about what's at issue to change their buying habits? Right, sure. Yes. And my question about the allegation, I think, is in this complaint, that this representation doesn't appear on all of the defendant's products, it appears on a product that costs a bit more. Yes, that's correct. It appears only on the Dove Dark Chocolate product line, which is part of what is so deceptive about the representation. So, if I were a chocolate consumer who cared about this issue, the idea is I would be more Because the Dreamers-Coutures doesn't have that. Absolutely. There are absolutely consumers out there who refuse to buy M&Ms because of the child labor issue, but would buy the Dove Dark Chocolate product. That kind of brings me back to my question. I'm trying to figure out, so this consumer that actually cares about it, because I agree, it makes sense that that would be our group of reasonable consumers. I think earlier you said if one consumer was misled, but I don't think that's the case law. I think the case law says it has to be, in our Becerra case, it has to be a significant portion. It requires more than a mere possibility that it might conceivably be misunderstood by a few consumers. So, it has to be, I agree it doesn't have to be all of them, maybe not even most of them, but it has to be a quote, significant amount. Would you agree with that? One person isn't enough. I mean, if it's only one person out of all the consumers, that probably is not reasonable, but it's not the majority of consumers. It's not necessary. So, let's just say it's a significant number. So, what evidence is there at all, or what even pleadings is there, that a significant number would read Rainforest Alliance, that Beans came from Rainforest Alliance, as showing that there's not child labor involved? That's what I'm trying to find out. I think you keep saying, well, they just care about ethical and all that stuff, but that's very vague. I don't, where's the tie to the actual thing that they care about, the child, or is ethical just some vague thing up there, and that's enough? If I can answer that by going back a little bit to the factual answer to your question, rather than the legal answer, sorry, which is, there are three different time periods at issue, which I think is, the defendants are conflating, which is, first, there's the point of time of sale. The what? Yeah. There's the point of time of sale, where Ms. Myers bought the chocolate. At that time, she thought the certification was meaningful, that someone was monitoring this chocolate. But how? What does she think, meaningful is a vague, what does she mean, what do you mean by meaningful? What did she actually think it was guaranteeing to her? That they were using ethical standards in producing the chocolate. But that's still kind of vague, because ethical means different things to different people. Did she actually think at the time that it meant that there was no child labor involved in making the beans and that chocolate? Is that what you're saying? I think she believed that it was being monitored for child labor violations. Can I ask you whether you allege that? I think in paragraph 15 of our complaint. I'm going to, I don't want to interrupt the answer to Judge Van Dyke's question. I'm going to have the same question for you about whether you, and maybe you could answer it when you come back, whether you ever allege a price premium theory. Do you use the phrase price premium? We did not use the phrase price premium in the complaint. You've got the facts in there, but that's what I'm trying to figure out. No, the basic fact that we allege was that she would not have bought the chocolate if she knew that it was not traceable and certified. Okay. So you answered, I don't want to, getting back to Judge Van Dyke's question, you said there are three points in time we should consider, the purchase time, and what were the other two times, quickly? Yes. So defendants say that she's conceded that the Rainforest Alliance is meaningless. That was our initial allegation, and then in our reply brief, we pointed out that Rainforest Alliance has actually upgraded its practices since the First Amendment complaint was filed. That's part of the reason we dropped that argument. So we're not making that allegation as to Rainforest Alliance at the given time. But in paragraph 15, you can see that in the time of sale, she said that she thought it was traceable, that she wanted to make sure that her product was not produced off the backs of child and slave labor, and that she would like to buy them in the future if they were traceable to ethical farms. Okay. And those were our allegations. Do you want to say the balance of your time? Yes, thank you. You bet. Morning, Your Honors. Morning. May it please the Court, David Forkner of Williams & Connolly on behalf of Mars Wrigley Confectionery, U.S. LLC. Judge Van Dyke, you had it exactly right. The issue here is she is assuming a theory of deception, which is that this package of Dove bars represents that there is no deforestation or child and slave labor because it was sourced from Rainforest Alliance farms. I think that's an overstatement of what she's claiming. Well, she's specifically talking about West Africa. You said none. You said none. Well, she says in paragraph 15 specifically, had she known it contained, she would not have bought. Yeah, that's a very different thing from what you just said. Right. She also says in paragraph 19 that these, there were three defendants at the time, that the defendants could have purchased with slave-free. Again, that's different from what you just said. Well, the bottom line, Judge Fletcher, is she can't get there through Rainforest Alliance certified farms. Well, let me respond. Let me see if that, because I'm looking at 15 here, and she says she would. Would not have bought their products if she would known that they were produced off the backs of child and slave labor. So it does seem to me, actually, child and slave labor is, in her allegations, is an on-off switch. If she knows something involves any child labor, she doesn't want it. And so that leads to the question, they're really hammering traceability. And I think that your claim about traceability is a little squishy in this. But what I'm struggling with is, how do they take, how does the reasonable consumer or Ms. Myers conclude from the fact that something was, even assuming it had come, all the chocolate had come from Rainforest Alliance certified farms, that that would mean that it was not quote from the, I'll quote her thing, that it was not produced off the backs of child and slave labor. And I'm trying to figure out what the link is between those things, and I guess what Correct. I'm not seeing it. And there is no such link. And there's a couple of reasons why there's no such link that she can plausibly make out here. So first of all, if you look on PAC specifically, look at affirmative representations, it says nothing about West Africans, slave labor, sustainability, ethical. Like in these other types of cases, you'll see someone claim sustainable chocolate, and they'll couple it with like an UTS certification. And those kind of cases have moved past the 12B6 standard. Here it just says Rainforest Alliance certified. So the question then is begged, what does that mean? And so we argued in, before the district court, two different district court judges, we argued six different reasons why plaintiffs fails to give meaning to the Rainforest Alliance certification seal, why MARS makes no representations about Rainforest Alliance specifically, why even if you go to judicial notice and start looking at Rainforest Alliance websites, they're not making any promises of actual output, like that it guarantees anything. They're making an effort promise, which would be a puffery in any event. We argue that those kind of statements by a third party certification entity wouldn't bind MARS anyway because they're not on PAC, and other reasons. So we outlined six reasons in the record. They don't respond to them in the district court at all. We then take the appeal, they don't respond to those six criticisms of Rainforest imbuing this sustainability, slave free, deforestation messaging. They don't bring that up in their opening brief. We then put in our answering brief the exact same six, and we actually add a seventh, on a waiver claim. They don't respond to that in their reply brief. So we have a situation where they have waived all along the way an argument that Rainforest Alliance actually stands for to the reasonable consumer, whether it's one or a dozen or 1,000, that it actually promises, to your point Judge Van Dyke, anything about chocolate that is even better than, I mean they certainly make efforts and they're out there as an NGO, they're a non-profit company. We specifically say they only cite Rainforest Alliance in two paragraphs of their complaint and that they're conclusory paragraphs at best. We made that argument in the first amended complaint motion to dismiss. They didn't fix it. We made it in the second motion to dismiss complaint. They didn't fix it. They don't fix it on appeal. Did the district court think that the complaint was not actionable because it was literally true or wasn't false? No, so I think the court did not only that step, Your Honor, but more. So the court recognized, and there's two different opinions, that it is in fact true. The question then is what inferences can be made? Well, or whether reasonable consumer would be misled. And she does allege that this representation doesn't appear on your other products. You heard me ask these questions, right? I want to make sure you have a chance to respond. But it does appear on your somewhat more expensive product. So I don't think I'm looking at the universe of consumers. I have the same question Judge Van Dyke has, which is, you know, how do we know they care? I think some people wouldn't care. I think some people would. And it does seem to me very likely that what she's got, what she's alleging, is really a price premium theory, that that subset of folks who are willing to pay more do care. So I just want to make sure I have your response to that, please. Okay, so, Your Honor, I'm hearing three different questions, ultimately. There's just one. Okay, well, I'm going to unpack it. So, to the extent that— I think she's got a price premium theory, right? Yes, yes. So I'm looking at people who are discerning consumers of chocolate. Correct. And I think what you're wanting me to say is that it's not plausible—and I'm purporting to prevail here—it's not plausible that that group of folk would be misled by this label. I'm actually thinking a slightly different tactic, Your Honor. All right. So let's assume whatever percentage of people don't care at all and to set them aside. Okay. Now let's take the discerning people in the Manuka honey, people who really care about honey. Those people who are really caring, the question is, what is the pleaded theory of deception? What are they caring about? She pleads that they care about West African deforestation and slave labor. Right. Okay? Those highly discerning people, then, have to infer that from the capacity of what does Rainforest Alliance certified cocoa promise? That's before we get to traceability on down the line, is what is the promise of Rainforest Alliance to those discerning people? And it's those discerning people who would realize that—and she doesn't plead what the certification means, that it doesn't promise any of that, that it's only aspirational. And so, quite honestly, the discerning consumer would never buy her theory. I'm not so sure you're right about that. It seems to me the discerning consumer might be the one who picks it up to look at the back or the side, wherever the representation is, and ask herself—there's a reason they put it on the label. Correct. So it must— They must be trying to tell me something about the product. What would a reasonable person understand the message to be? Correct. The reasonable person would understand that it is Rainforest Alliance certified. That's what it means. And the question is, what does that mean on top of that? And so, what happens is, first we look at—nothing on the pack tells them anything about that. So we're taking inference upon inference now. So there's two implied inferences that they have to make, according to the complaint. Inference one is that Rainforest Alliance certified cocoa—remember, these are discerning consumers about West African slave labor and deforestation. That's the people she's identified. That they would have to be able to discern from Rainforest Alliance certification that this product is either free from or majority benefited by, such that it doesn't really exist in that chocolate. And I'm telling in the first step, she can't get past that assumption. So it's like the Becerra-Dr. Pepper case, where you can't establish the diet in the first instance. If you don't get the diet, we don't get to the aspartame. Try to get past that. What I'm struggling with is, I just don't see anywhere in the complaint that she's tried to bridge that gap. Because what they do is they mention Alliance certified, like you said, very briefly, and then the rest of it is the word ethical and some other word, I can't remember. But these sort of vague terms, but it doesn't, that doesn't, what do they need to do to bridge that gap? I guess they'd have to have factual allegations about what people think about what Rainforest Alliance certification means, as far as the two things that they say they care about. Right. So I think other plaintiffs have tried to bridge this gap. So what they have done empirically in the case law is they will say, here's what the PAC says, and the PAC doesn't say anything about Rainforest, West African, anything. So then they go to websites, and they look at like Rainforest Alliance websites, and they say, okay, so what promises are actually being made by that third party NGO? And then they couple them together in a complaint. Now the folly in that, I think historically, and now we're debating a fictitious complaint, is that when you go to the websites, and you go to these other representations, you get not only the platitudes of goals, but you get their clarifications. So if we had the websites here, we'd say exactly what Rainforest Alliance says with regard to cocoa in West Africa. And we put those together, and you'd have like the Kerrygold Butter case, which talked about grass-fed cows. And while the plaintiff said, oh, we promised grass-fed cows, but the websites actually disclaimed that. And so that's when you would run into problems trying to bridge that gap, which is why I think plaintiffs keep standing on the concept of just on-pack. But having stood on just on-pack theory, they run into this problem that there are no such on-pack affirmative misrepresentations or reasonable inferred ones, even amongst like the Manuka highly discernible consumers. Those consumers would actually know what Rainforest does and does not say, none of which, of course, is pleaded in the complaint. So when you take out the waiver issues, again, they have not defended Rainforest Alliance at all. In the reply brief, they say, we have waived our claim about the efficacy of Rainforest. True. But they have also waived any argument as to the representations made by Rainforest, by Mars, by Rainforest. So you have a complaint now devoid of any beneficial allegation on Rainforest, and you're stuck with just traceability. And there, when we turn to that would be the second assumption, traceable from farm all the way to bar argument. So they had started initially pleading in paragraph 47 of the second amended complaint that traceable itself meant some sort of environmental ethical standard. We pushed back on that in the district court, citing all the various dictionary definitions as to what traceable means. They don't dispute that. They have now accepted it. The traceable simply means capable of being traced. And so inherent in traceability, then how does that impact their claim? Well, now we have no environmental benefit claim whatsoever even inferred under the way that the case is presented to this court on this record. It's just traceable. And traceable simply means traceable from point A to point B. So you're saying traceable means it's traceable, but we don't trace. No, that's not what I'm saying. I'm saying that significance to her pleaded theory of deception, which is slave labor and deforestation is now broken. Traceable means capable of being traced. So if I trace my steps from that chair to this lectern, that's where I've traced my steps. No, I'm asking a different question. And I might be misunderstanding the thrust of your argument. Traceable means it can be traced. Correct. Are you saying that this means only that it can be traced, not that it's a representation that it is traced? No, I'm actually saying neither of those. So it's my confusion, Your Honor. Plaintiffs admit that it is true that it can be traced from the farm to the factory. That's where we step. My argument was, and if you're a textualist, that's what says what it means. In fact, traceability has this inherent concept of point A to point B. It has a distance concept to it. Right? And so... And are you saying, you wanted me to interpret this as saying, it's traceable, but we're  No, not at all, Your Honor. So what are you saying that traceable means here in this context? I'm saying that the statement traceable from farm to factory means exactly that. Well, no, I just asked you what does that mean, and you just said it means exactly that. Right. Okay, what does exactly that mean? It means you can trace farm number 5,653 in Ghana through the transportation system to the factory. I get that. But then I'm asking, are you also saying, do you want the consumer to understand that not only is it traceable, but that it is actually traced? And it is. That's our point. They admit the truth of it is traceable, and it is actually traced to factory. So you're saying traceable here means traced. Where we differ is traceable to what point. So they read traceable from factory through stages of production to end unit bar. If you look at the Wright case, which is a Don't look at the Wright case. They read it that way, and you read it how? I read it exactly as it says. It stops at the factory floor, or it stops at the factory. And the beans, I thought, was uncontested. The beans are then mixed together, and you can't tell what winds up in a Chaka bar. So I think we're a little bit different on that, Your Honor. That is the plaintiff's allegation, that they get intermingled. What the clarification that they rely upon is on the web page for Mars. And the web page says that they don't guarantee traceability and segregation to bar. But traceability What does that mean? I don't understand what you're saying. I really don't. I thought this was uncontested. I hear you. And so now you've got a problem on your hands. Go back to traceability. Sure. Because I understand what your representation is about what the plaintiffs say. I just need to know, what is your position about traceability? Our position is that Mars does not promise to or guarantee, which is the clarification, ensures the actual statement on the website, traceability past the factory door to an individual bar. Okay. I think that's what I just said, and you corrected me. Well, what I think is the significance of it is what we're debating amongst the plaintiff and Mars. So we say that that to be a true fact. I've taken yes for an answer. Okay. I guess I'm overthinking it, Your Honor. All right. Go ahead. But the significance is, again, it has nothing to do with slave labor, deforestation, no promises like that. Because you don't think that it really has nothing to do with traceability, has nothing to do with slavery or deforestation. Her whole argument is that that is the implication. Correct. What's your best response to that, that discerning consumers would not understand that meaning from that verb? Right. My best argument on that is you have to obtain that understanding from it being Rainforest Alliance certified. Okay. So this goes back to it's true. I think it's contested. I think it's the first question Judge Fletcher asked. Is it true? The statement's true. Correct. Or at least it's not false. Yep. Right? And so the question, I think from day one in this case, we're talking about is it misleading? Correct. All right. And I've told you why I tend to think this would be the discerning customer. Correct. And you think the concerning customer would get nothing from that package, no message. I'm thinking... And would go look at... Sorry. And then would go look at the website and wouldn't understand something different. So I think they would only get... I am looking for. Yeah. Sorry. Is your response to what I think is her argument, which is from that package, her consumer group would take a message, would likely be misled, and I think her position is that's a question of fact. And I just would really like to get your response on that point. Right. My response to that is they waived all six challenges to the Rainforest Alliance giving any such message. All right. And so including the pleading, the plausibility, it's all in our brief, but they literally have waived it multiple times over. You know, obviously your client puts this on the Dove line of chocolates for a reason. Understood? Do you agree? I understand they support Rainforest for some products and not others. Correct. That's not quite what I said. They put it on for a reason. Correct. And it is a reason, I think, that they think that if they put that on there, they can get more money. Well... Because this is a higher priced product among the Mars line. So they have to think that it means something to some consumers. It's just that it turns out that it doesn't mean what the consumers seem to think it means. So what am I supposed to do with that? So I think it's... I know I'm over time. I'll try to be brief. Fine. What it means is that Mars, for some products, supports the Rainforest by buying product volume. And in other products, they do not. And that is a laudable goal on a normative function to encourage non-profit organizations to try to get out there and do good things. And when you're comparing, when you're looking at the comparison cases, Your Honor, those are totally different cases. Those are trying to find contextual meaning from one affirmative misrepresentation to another. So extra strength versus regular strength. They're looking at rapid release versus regular release. This is, for some product lines, and it's more expensive to Mars, by the way, it's not the record, but it's more expensive in Mars to buy Rainforest Alliance certified cocoa. The idea is Rainforest Alliance then passes on some of those benefits through farmers, education, training, and the like. It's a non-profit. It's a good thing. And so, one, Rainforest Alliance isn't probably big enough to make all of Mars' products Rainforest Alliance, right? I mean, they make M&Ms and Milky Ways and all of this kind of stuff. You're not looking at the Milky Way to discern the meaning of the Rainforest Alliance seal. They're totally unrelated. You're simply saying we support, when you buy, Judge, if you go buy Dove, and just because you love it, let's assume that you're not a Manuka honey buyer, you are supporting the driving demand for Rainforest Alliance cocoa. And when you drive demand, economics, you drive price. And when you drive price, you can pass that price on. Farmers can earn more. So it has promised benefit. It's an economic kind of demand pull model of an NGO. But what it doesn't guarantee, and what plaintiffs have waived that it guarantees multiple times over, is slave-free, child-free, deforestation-free, gender equity-free, and any other CO2 emission-free issues. And if we challenge Rainforest Alliance and say, look, Rainforest Alliance, if you put that on your product, you're making promises, right? And that Rainforest Alliance doesn't deliver, that's the end of Rainforest Alliance. Because they don't promise that they can deliver. It's just an NGO dealing with incredibly complicated socioeconomic and environmental problems. They're just one part of the solution, hopefully. So for those reasons, Lisa Venn, thank you. Thank you. I think the consumer does not need to let the perfect be the enemy of the good. The consumer has a real interest in ensuring that companies monitor their supply chains and make efforts to produce a product that is not using child labor. And I think what my colleague has argued is that there's no guarantee that any product is 100% free of bad practices. But there's a segment of consumers here that really care that the company is making an effort to monitor their supply chain. So his argument is that that discerning group of consumers are exactly the kind of people you would expect to go look at the website for Rainforest Alliance. What is your response to that, please? The case law is clear that the consumers do not need to go look at the website. Consumers make decisions in the grocery store. They don't have to look something up as they're shopping. They can rely on the on-pack language. And I don't think that my colleague is actually making that argument in his briefs. His first argument is that you waived us. So do you want to speak to his waiver point? I don't believe that we have waived anything regarding the materiality of the consumer concerns. I'm not totally sure I understand what he thinks that we have waived. Because we did waive contesting that Rainforest Alliance. Let me see if I can explain so you can respond. Because you say in your complaint, in paragraph 15, you say she suffered injury, Meyers suffered injury because she would not have bought the products if she had known that they were dot dot dot produced off the backs of child and slave labor. And there's nothing in the complaint or even sounds like in the real world that would indicate that just because something is Rainforest Alliance certified, that that means that it doesn't involve any child labor or slave labor, unfortunately. And so if that's what your complaint is, is that I wouldn't have bought it if I thought it had any child labor. And the certification that you're focusing on traceability, but even assuming that you're able to trace it to that, that wouldn't actually help demonstrate the child labor thing. You've got a big gap. And I think his argument is, so as to the waiver point, is that you've never tried to fill that gap in with anything. You don't do it in your complaint when they pointed it out in their answering brief. You didn't do it in your opening brief. That's I think what he's saying is waiver. So why have you not waived that? I think this goes back to the time period issue. So at the time of sale, Ms. Meyers did not know about the child labor that was present in Mars's supply chain. Correct. And so she wouldn't have bought this product if she'd known that she was buying uncertified untraceable cocoa that was traced back to this region. At the current time, Ms. Meyers has alleged, and that's, I'm sorry, but we have specifically alleged that she would buy the product if the products were actually traceable to ethical farms as advertised by Mars. So she has... The idea that she didn't know when she bought it, but she's discerning and so now she's been deceived. She was deceived when she bought it. Yeah, she was deceived when she bought it. And I think that it overstates the burden on consumers to say that, well, a discerning consumer would have done a lot of research about chocolate before caring about ethics. I think there are a lot of consumers out there, we've alleged 64% of global consumers do care about these issues. Not all of those consumers are going to do a deep dive into every company's supply chain. The question is, what do the companies put on their packs that make the consumers think that they're buying from a company that's monitoring their supply chain and that is tracing their chocolate? And what Mars here did was put a statement on the packs that was meaningful to the consumer to induce them to buy the product that, in fact, was not true. It created this deception that, okay, I'm buying this product, I get traceable cocoa in this product. When, in fact, they're intermingling their beans, they're giving the consumer something with no meaningful difference from the other products, absolutely no meaningful difference. We're well over your time, so I'll thank you for your argument, both of you, and we'll take that case under advisement.
judges: FLETCHER, CHRISTEN, VANDYKE